# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8138 | **DATE** | 2/19/2002 |
| **CASE TITLE** | Sheri Crampton vs. Abbott Labs | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. For the reasons set forth in this opinion, Crampton's motion for summary judgment is granted,(23-1) while Abbott's motion is accordingly denied on the breach of contract claim but is granted on the retaliatory discharge claim. (21-1) With the issue of liability having been thus resolved, Crampton is entitled to damages stemming from Abbott's refusal to process her option request. This action is set for a status hearing at 8:30 a.m. February 28, 2002 to discuss the procedures and timetable needed to resolve that issue.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | | |
| | No notices required. | | | | |
| X | Notices mailed by judge's staff. | | FEB 2 0 2002 | | 40 |
| | Notified counsel by telephone. | | date docketed | | |
| M | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| SN | courtroom deputy's initials | 02 FEB 20 PM 4:51 | Date/time received in central Clerk's Office | mailing deputy initials | |

SHERI CRAMPTON,                      )
                                     )
                    Plaintiff,       )
                                     )
      v.                             )      No.  99 C 8138
                                     )
ABBOTT LABORATORIES,                 )
                                     )
                    Defendant.       )

**DOCKE**

FEB 2 0

### MEMORANDUM OPINION AND ORDER

Sheri L. Crampton ("Crampton") has filed a two-count

Complaint against her former employer Abbott Laboratories

("Abbott"), claiming that in violation of Illinois law (1) Abbott

terminated her unlawfully in retaliation for her whistle-blowing

activities and (2) Abbott breached a series of option contracts

by refusing to allow her to exercise stock options granted under

Abbott's Incentive Stock Option Programs.[1]  Both sides have now

filed Fed. R. Civ. P. ("Rule") 56 summary judgment motions,[2] with

---

[1]  Although Crampton has voluntarily dismissed her claim
advanced under Title VII, federal jurisdiction remains to
entertain her state law claims in diversity of citizenship terms:
Abbott is an Illinois corporation with its principal place of
business in this state, Crampton is a California citizen and the
amount in controversy exceeds $75,000.

[2]  Each side has complied with this District Court's LR
56.1, designed to facilitate the resolution of Rule 56 motions by
highlighting the existence or nonexistence of factual disputes.
This opinion cites to the two LR 56.1(a)(3) statements as "C. St.
¶ --" and "A. St. ¶ --."  Responses to those statements are cited
as "A. Resp. ¶ --" and "C. Resp. ¶ --."  LR 56.1(b)(3)(B)
statements of additional facts are cited as "C. Add. St. ¶ --"
and "A. Add. St. ¶ --," and the corresponding responses are cited
as "A. Resp. Add. St. ¶ --" and "C. Resp. Add. St. ¶ --."  This
opinion employs the same "C." and "A." abbreviations in referring

/ /

Abbott moving for summary judgment on both counts and Crampton requesting summary judgment as to liability on the breach of contract claim only. For the reasons set forth in this opinion, Crampton's motion is granted, while Abbott's motion is accordingly denied on the breach of contract claim but is granted on the retaliatory discharge claim.

<h2 style="text-align:center">Summary Judgment Standards</h2>

Familiar Rule 56 principles impose on each movant the burden of establishing both the lack of a genuine issue of material fact and the movant's entitlement to judgment as a matter of law (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (<u>St. Louis N. Joint Venture v. P & L Enters., Inc.</u>, 116 F.3d 262, 264, 265 n.2 (7th Cir.1997)). As <u>Pipitone v. United States</u>, 180 F.3d 859, 861 (7th Cir. 1999) has more recently quoted from <u>Roger v. Yellow Freight Sys., Inc.</u>, 21 F.3d 146, 149 (7th Cir. 1994)):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

Where as here cross-motions for summary judgment are

---

to each of the parties' exhibits ("Ex."), memoranda ("Mem."), answering memoranda ("Ans. Mem.") and reply memoranda ("R. Mem.").

involved, it is thus necessary to adopt a dual perspective. This opinion reflects that approach where appropriate.

## Background

### Crampton's Employment and Discharge

Crampton began working for Abbott on April 15, 1991 as a senior Clinical Research Associate (A. St. ¶ 28). She was promoted twice, so that in August 1998 she held the position of Assistant Director of Clinical Research for the Macrolide Venture (A. St. ¶¶3, 28). In that position she reported directly to Dr. George Aynilian ("Aynilian"), Associate Venture Head of the Macrolide Venture, who in turn reported to Venture Head Dr. Carl Craft ("Craft")(A. St. ¶4).

Throughout her employment at Abbott Crampton was actively involved with the Abbott Research Quality Assurance, Standard Operating Procedures and Guideline Rewrite Committee, and she was well-known for her knowledge of clinical rules and regulations (C. Ex. H). In that regard she voiced repeated complaints from 1992 to 1998, asserting violations of various clinical protocols and FDA regulations by Abbott employees (A. St. ¶¶8-23).

On August 3, 1998[3] Crampton sent this e-mail message to eight Abbott employees, three of whom reported directly to her

---

[3] Because all other operative events bearing on Crampton's claims also took place during 1998, any date referred to later in this opinion without a year designation relates to 1998.

3

(A. St. ¶¶29-31):

> Subject: Searle/Monsanto HR Contact
>
> For those who may be interested, here is the contact person and e-mail address for the head of HR/hiring for the Chicago area:
>
> Linda Delavallade (formerly from Abbott as well!!)
>
> e-mail=linda.h.delavallade@monsanto.com@internet
>
> She and her team are working on implementing upper management's decisions (post merger with Monsanto) who stays in Chicago-land, who has to relocate to the east coast, who has an option to relocate, etc. They should be finished with that process in a week or two. If you want to contact her first to discuss possible openings, her phone number is 982-7211 and fax is 982-4637. Otherwise, if you have a current CV, you can attach it to a memo and send it via e-mail.
>
> Good luck! And will the last one out please turn off the lights?

Craft found a copy of that e-mail in his in-basket on August 4 (id. ¶32). After reading the e-mail he spoke with his boss, Dr. Leonard ("Leonard"), as well as with the Manager and the Director of Human Resources (id. ¶35). Leonard believed the e-mail was so disruptive and inappropriate as to warrant Crampton's immediate termination and further believed that Crampton had violated her employment agreement with Abbott (id. ¶¶36, 37).[4] While various

---

[4] That agreement provided in relevant part (id. ¶38):

> EMPLOYEE shall not, during the term of employment with ABBOTT,...directly or indirectly, for the benefit of EMPLOYEE or others, employ, attempt to employ, solicit for employment, or in any other way, assist in employing,...any employee of ABBOTT about whom EMPLOYEE acquired knowledge through EMPLOYEE'S ABBOTT employment.

4

Abbott executives agreed that Crampton's e-mail displayed poor judgment and disloyalty and warranted termination (id. ¶¶36, 41), Craft was ultimately responsible for the termination decision (C. Add. St. ¶92).

Human Resources Manager Michael Spengler ("Spengler") met with Crampton on August 6 to discuss the e-mail (A. St. ¶42). At the meeting Crampton said that she did not think the e-mail was a problem (id. ¶43) and attempted to explain that she intended the last line as a joke (C. Add. St. ¶87). On August 10, 1998 Craft and Spengler met with Crampton and told her that she had been terminated because of the lack of judgment, loyalty and professionalism reflected in the e-mail (id. ¶50).

Crampton's Stock Options

Crampton was granted stock options three times during her years at Abbott: in 1995, 1996 and 1997 (C. St. ¶¶2-4). At the time of her termination she had options for over 5000 shares available for exercise (C. St. ¶5). Each grant was pursuant to an option contract, and each contract contained a materially identical provision under which a terminated employee could exercise an option within three months after his or her last day of work, except that each option would terminate immediately if the employee were to "engage[ ], directly or indirectly, for the benefit of the employee or others, in any activity, employment or business...which, in the sole opinion and discretion of the

5

Compensation Committee, is competitive with the company or any of its subsidiaries" (id. ¶6).

Elizabeth Fowler ("Fowler") is the Abbott employee who processes the exercising of stock options (C. St. ¶13). She was notified on August 28 that Crampton had been terminated, and she asked Jill Mueller in Human Resources to obtain a document known as the non-compete verification form (A. St. ¶69), which sets out whether a former employee is competing with Abbott in his or her new employment (id.).

On September 2 Crampton's husband Demetre Svolopoulos ("Svolopoulos") telephoned Fowler, saying that Crampton wished to exercise her options and asking Fowler to send him the exercise forms (C. St. ¶18). Fowler told him the options could not be exercised until Fowler had the non-compete verification form (C. St. ¶19). Svolopoulos said truthfully that his wife was not employed at the time and was currently seeking employment (C. St. ¶20). Fowler made another attempt to obtain the form from Human Resources later that same day, and she ultimately received it on September 8 (C. St. ¶¶21, 23). In response to the question "[w]ill the optionee be competing with the company in his/her new employment?" the form was marked "no," but there was a handwritten qualifier stating "do not know her plans at this time" (A. St. ¶76).

"In the perfect world, if in fact time allowed," Fowler

6

would try to send a letter to any terminated employee who was not competing, advising the employee of the last date for exercise of stock options, as well as about the stock option statement (Fowler Dep. 56). If time were too short, a telephone call would be tried instead (id. 57). But Fowler did neither of those things for Crampton, assertedly because Fowler was unsure whether Crampton was terminated or was on leave status (id.). Instead Fowler didn't communicate with Crampton for fully two months after she had the Human Resources form in hand on September 8.

Although Crampton was not employed on September 2, she signed a contract with Agouron Pharmaceuticals on September 29 and began work there on October 5 (C. St. ¶50). On November 10 or 11 Fowler telephoned Crampton, who said she still wished to exercise her options (C. St. ¶31). On November 11 Crampton asked Fowler to fax her a stock option exercise form and told Fowler that she was employed (C. St. ¶32). That same day Fowler faxed Crampton two forms with a direction that she "send a check payable to Abbott Laboratories in the amount of $125,289.96" post-marked no later than November 17 (C. St. ¶34). Fowler wrote a note on the form that Crampton's exercise was "Subject to Noncompete Verification" (A. Add. St. ¶5). She then reported Crampton's employment to Human Resources (C. St. ¶¶33, 40). On November 17 and 18 Fowler received payment for the options (C. St. ¶42, A. Add. St. ¶7).

Then on November 19 Fowler received an e-mail from Spengler stating that Crampton was working in a competing position (C. St. ¶44). By November 25 Abbott had determined that Crampton would not be allowed to exercise her options because her employment with Agouron was competitive with Abbott (C. St. ¶46). On December 4 Fowler wrote Crampton that she would not be allowed to exercise and returned her check, which had never been deposited (C. St. ¶48, A. Add. St. ¶9).

## Retaliatory Discharge

Even though Illinois is an employment-at-will state, the tort of retaliatory discharge provides a narrow exception to the general rule that employment is terminable at any time for any reason or for no reason at all (<u>Johnson v. World Color Press, Inc.</u>, 147 Ill. App.3d 746, 748, 498 N.E.2d 575, 576 (5th Dist. 1986)). That narrow exception is described succinctly in <u>Lanning v. Morris Mobile Meals, Inc.</u>, 308 Ill. App.3d 490, 491, 720 N.E.2d 1128, 1129 (3d Dist. 1999), quoting <u>Jacobson v. Knepper & Moga, P.C.</u>, 185 Ill.2d 372, 376, 706 N.E.2d 491, 493 (1998):

> A claim of retaliatory discharge is permissible where "an employee is discharged in retaliation for the reporting of illegal or improper conduct," also known as "whistle blowing."

To establish a valid claim fitting that mold a plaintiff must show that (1) he or she has been discharged, (2) the discharge was in retaliation for his or her activities and (3) the

discharge violates a clear mandate of public policy (<u>Hartlein v. Ill. Power Co.</u>, 151 Ill.2d 142, 160, 601 N.E.2d 720, 728 (1992)).

Public Policy

Crampton alleges that her termination was contrary to the state and federal public policy favoring compliance with governmental regulations in the testing, reporting and marketing of pharmaceuticals to be sold to Illinois citizens (Complaint ¶¶33-34). To qualify for the retaliatory discharge exception a public policy "must strike at the heart of a citizen's social rights, duties, and responsibilities" (<u>Palmateer v. Int'l Harvester Co.</u>, 85 Ill.2d 124, 130, 421 N.E.2d 876, 878-79 (1981)) or involve the protection of the health and safety of citizens generally, rather than implicating purely private interests (<u>Doherty v. Kahn</u>, 289 Ill. App.3d 544, 559, 682 N.E.2d 163, 174 (1st Dist. 1997), citing <u>Wheeler v. Caterpillar Tractor Co.</u>, 108 Ill.2d 502, 511, 485 N.E.2d 372, 377 (1985)).

Here the asserted source of the public policy is the pronouncement of the Illinois Supreme Court in <u>Palmateer</u>, 85 Ill.2d at 132, 421 N.E.2d at 879-80, relying in part on the preamble to the Illinois Constitution:

> There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens.

That categorization has been found sufficient to state a claim in several contexts (see, e.g., <u>Lanning</u>, 308 Ill. App.3d at 493, 720

9

N.E.2d at 1131; <u>Sherman v. Kraft Gen. Foods, Inc.</u>, 272 Ill.
App.3d 833, 838-39, 651 N.E.2d 708, 712 (4th Dist. 1995); <u>Balla</u>
<u>v. Gambro, Inc.</u>, 145 Ill.2d 492, 499, 584 N.E.2d 104, 107-08
(1991); <u>Wheeler</u>, 108 Ill.2d at 510-11, 485 N.E.2d at 377).

While some of Crampton's complaints (including improper
intra-company billing and falsification of expense reports (A.
St. ¶¶8,12, 18)) do relate solely to Abbott's private interests,
others may implicate the <u>Palmateer</u>-described policy. Thus in
1995 or 1996 Crampton complained that Craft was promoting a drug
for an unapproved indication (<u>id</u>. ¶14), and she told an audience
of physicians to whom he was giving a presentation that he had
omitted data pertaining to patient death rates (<u>id</u>. ¶15); in 1997
she complained that investigators had changed the definitions of
"cure" and "failure" so that more patients fit the definition of
"cure" (<u>id</u>. ¶19); and in 1998 she challenged an investigator's
data as fraudulent (<u>id</u>. ¶¶21-22).

Because the ensuing discussion shows that Crampton's failure
on the causation element of her retaliatory discharge claim
torpedoes the entire claim, this opinion need not decide such
difficult state law questions as (1) whether Crampton's
particular complaints were indeed serious enough to invoke the
policy protecting the lives and property of Illinois citizens and
(2) whether violations of regulatory practices in the United
Kingdom and France can implicate Illinois public policy. Hence

this Court turns directly to the issue of causation.

Causal Connection

Under Illinois law the burden of proving all elements of a retaliatory discharge claim remains with plaintiff at all times (Clemons v. Mech. Devices Co., 184 Ill.2d 328, 338-39, 704 N.E.2d 403, 407-08 (1998)). As for the causation element, the ultimate issue is the employer's motive--if the employer has a valid nonpretextual basis for discharging the employee, the employee loses (Hartlein, 151 Ill.2d at 160, 601 N.E.2d at 728). In the present context, Crampton's burden is to demonstrate the existence of a genuine issue of material fact on that score.[5]

Abbott maintains that Crampton's termination had nothing to do with her whistle-blowing and was a direct response to the poor judgment and lack of loyalty displayed by her encouraging subordinates to seek employment with a competitor in her August 3 e-mail (A. St. ¶¶47-48, 50). In an attempt to label that explanation as pretextual, Crampton argues that other employees who engaged in the same conduct were neither investigated nor terminated (A. St. ¶51-57, C. Add. St. 74-83): She points to Jon

---

[5] Recent Seventh Circuit cases (see Bourbon v. Kmart Corp., 223 F.3d 469, 473 (7th Cir. 2000) and Borcky v. Maytag Corp., 248 F.3d 691, 696 n.5 (7th Cir. 2001)) have suggested that the burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) may apply to state retaliation cases litigated in federal court. Because this opinion later establishes that the same result obtains under either Illinois tort law or the McDonnell Douglas approach, this Court also finds it unnecessary to choose between the constructs.

11

Avila ("Avila"), who printed job postings from the Internet and shared them with other employees (C. Add. St. ¶¶74-76), and to Linda Swanson ("Swanson"), Assistant Director of the Macrolide Venture, who told Crampton about job opportunities at another pharmaceutical company and then sent her an e-mail identifying the relevant contact person (C. Add. St. ¶¶77-80, C. Ex. O). Here is the text of Swanson's e-mail (C. Ex. O):

> Subject: Helene's Pearlman-Beckman's number
> Sheri,
> She still uses Pearlman.  Her number is 847 509 1595,
> extension 6199.
> Later, alligator.
> Linda

As to Avila's conduct Abbott responds, and this Court agrees, that he and Crampton were not similarly situated. To that end a court must look at all the relevant factors (Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000)). In matters of discipline a plaintiff must normally show that the assertedly comparable employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (id. at 617-18). Here Avila was a clinical research associate, while Crampton was an Assistant Director of Clinical Research--the supervisor of clinical research associates (A. St. ¶¶3, 57). It was because of her leadership role and her high level position that Abbott considered her conduct particularly

12

egregious and worthy of termination (A. St. ¶¶40-41). In the related area of employment discrimination (where the issue of "similarly situated" employees also plays a critical role), Illinois caselaw expressly distinguishes between employees occupying such significantly different levels within the employer's hierarchy (Traficano v. Dep't of Human Rights, 297 Ill.App.3d 435, 440, 697 N.E.2d 372, 375 (1st Dist. 1998)). Relatedly, Crampton sent the e-mail to employees whom she directly supervised (A. St. ¶31), while she has not shown that Avila shared postings with his subordinates. But perhaps most importantly, Crampton has not shown that her managers (who were her decisionmakers) were even aware of Avila's conduct.

As for the e-mail sent by Swanson (who unlike Avila was Crampton's peer), Abbott urges that it was merely passing along a telephone number without further comment (A. Mem. 7). Aynilian testified that if he had known of the Swanson e-mail (something that he disputed[6]), he would not have alerted Human Resources or

---

[6] Crampton initially testified on June 7, 2000 that she did not show Swanson's e-mail to anyone (A. Ex. 2 at 117). Yet on August 10, 2001 she changed her tune, saying that she had shared the e-mail with both Aynilian and Spengler before she was terminated (A. R. Mem. Ex. 2 at 62). This Court is not required to credit such revisionist history, which is at odds with Crampton's earlier sworn testimony (see, e.g., Russell v. Acme-Evans Co., 51 F.3d 64 (7th Cir. 1995) and numerous cases cited there; Gray v. Ameritech Corp., 937 F. Supp. 762, 767-69 (N.D. Ill. 1996)). But even if it were assumed that Aynilian and Spengler learned of the Swanson e-mail while investigating Crampton, that does not create a factual issue as to whether similarly situated others were treated more favorably, for there

13

investigated that e-mail because it was simply two individuals sharing a phone number (Aynilian Dep. 75-76). In contrast to Crampton's e-mail, Swanson's does not refer to another company, encourage submission of a resume, or on its face violate the terms of Abbott's employment agreement. While Crampton's e-mail was sent to several subordinates, Swanson's went to a single co-worker of equal stature within the company. And again, any contention that Crampton's supervisors were aware of Swanson's e-mail before Crampton herself was terminated is on shaky ground at best (see n.6).

Crampton posits that both Craft and Aynilian admitted that they would not fire another person under similar circumstances (C. Ans. Mem. 5, C. Add. St. ¶81). Those assertions are without record support and distort the evidence actually presented. In fact Aynilian testified that he did not consider Swanson's e-mail to be the same as Crampton's and that he would not have investigated that e-mail incident (A. R. Mem. Ex. 5 at 74-76). And Craft's testimony merely states that if Crampton's e-mail had actually contained language attempting to forewarn job-seeking co-workers of unstable working conditions at Searle, an explanation contradicted by the plain language of the e-mail, he

---

are obvious and important differences in the two e-mails. This Court must avoid acting as a "super personnel manager" and second-guessing Abbott's legitimate business decisions to pursue Crampton's e-mail but not Swanson's (Brasic v. Heinemann's Inc., 121 F.3d 281, 287 (7th Cir. 1997)).

would not have had a problem (C. Add. St. ¶90, Craft Dep. 83). Crampton's unsupported conclusions certainly do not constitute evidence of causation.

Nor does Crampton's other evidence assist her in creating an inference of retaliation. Initial confusion as to whether Aynilian or Craft was ultimately responsible for Crampton's termination simply does not create a reasonable inference, as Crampton would have it, that Abbott misled her in an attempt to hide the fact that Craft was retaliating for Crampton's whistle-blowing (C. Add. St. ¶¶95-96, C. Ans. Mem. 6). As for Abbott's destruction of Crampton's electronic files, Abbott presented uncontested evidence that the files were destroyed in the normal course of business (A. R. Mem. Ex. 7).

Crampton's assertions that her termination was in retaliation for her whistle-blowing activities are further belied by the history of her employment at Abbott. During the 1992-98 years in which she was a self-proclaimed whistle-blower, Crampton was promoted twice, given eight salary increases and granted stock options three times (A. St. ¶¶27-28, 61-63).

Summary

Although Crampton may well believe that she was treated unfairly by Abbott, she cannot create a reasonable inference that such treatment was actionable, for she has presented no evidence from which such an inference of retaliation may fairly be drawn.

In retaliatory discharge cases summary judgment is appropriate where the plaintiff fails to present evidence sufficient to raise a genuine issue of material fact as to motive (<u>Carter v. G.C. Elec.</u>, 233 Ill. App.3d 237, 241, 599 N.E.2d 11, 13 (2d Dist. 1992)). Hence Abbott is entitled to judgment as a matter of law on that claim.[7]

### Breach of Contract

To succeed on a breach of contract claim under Illinois law, a plaintiff must prove the existence of a contract, performance by plaintiff, breach by defendant and resultant injury to plaintiff (<u>Gallagher Corp. v. Russ</u>, 309 Ill. App.3d 192, 199, 721 N.E.2d 605, 611 (1st Dist. 1999)). Here the parties advance different interpretations of this contractual language (C. St. ¶6) in support of their cross-motions for summary judgment:

> 4. Subject to paragraph 10, if employment of the employee with the company and its subsidiaries terminates, for any reason other than retirement, disability or death, this option may be exercised by the employee to the extent permitted under paragraph 3 [vesting] within three (3) months after the employees's [sic] last day of work, but

---

[7] That same result obtains under a <u>McDonnell Douglas</u> analysis. Like our Court of Appeals, in appropriate cases this Court has turned directly to the third step in that analysis-- whether the employer's asserted nonretaliatory reason is pretextual. And on that score the employee must ultimately show either "(1) that the employer was more likely motivated by a discriminatory reason, or (2) that the employer's proffered reason is unworthy of credence" (<u>McCoy v. WGN Cont'l Broad. Co.</u>, 957 F.2d 368, 372 (7th Cir. 1992)). What has already been said in this opinion confirms the absence of a genuine issue of fact creating any such inference.

not beyond the original term of the option.

\*       \*       \*

10.   Notwithstanding paragraphs 4, 5 and 6, this option
      shall immediately terminate in the event the
      employee engages, directly or indirectly, for the
      benefit of the employee or others, in any
      activity, employment or business during employment
      or within twelve (12) months after the date of
      termination or retirement[8] which, in the sole
      opinion and discretion of the Compensation
      Committee, is competitive with the company or any
      of its subsidiaries.

## Breach of Contract on or Within Days After September 2

Crampton argues that those contractual terms do not bar the

exercise of stock options as long as the individual is not

competing at the time of his or her desired exercise.  Thus, the

argument goes, because she was not working for a competitor of

Abbott on September 2 (when her husband first telephoned Fowler

and asked to exercise her options), Abbott's delay and subsequent

refusal constitute a breach of contract (C. Mem. 7-8).

Abbott counters by contending that the contracts require former

employees to refrain from engaging in competitive employment for

the full three-month period following termination--in other

words, that options terminate immediately if an employee engages

---

[8]   [Footnote by this Court]  This paragraph speaks of 12
months because that is the time within which an employee who
retires (as contrasted with one who is terminated) may exercise
his or her options.  Abbott Ans. Mem. 4 n.2 confirms that as to a
terminated employee the non-competition provision in Paragraph 10
is three months, thus meshing with the Paragraph 4 limitation on
exercise of an option.

in competitive employment during the ensuing three months, irrespective of whether the employee was competing at the time he or she expressed the desire to exercise (A. Ans. Mem. 3-5).

But a conclusive and fatal flaw (and there are others) in Abbott's "wait-and-see" argument is that it expressly admitted the converse in its Response to Crampton's initial LR 56.1 statement--there Abbott flatly confirmed that the non-compete clause does <u>not</u> bar the option's exercise as long as the person desiring to exercise is not competing at the time of the request (C. St. ¶9 and A. Resp. ¶9):

> 9.   The non-compete clause (paragraph 10 in exhibits B, C and D) does not bar exercise of stock options so long as the person is not competing at the time of exercise.  This applies even if the person does not know if he or she will be competing at any time subsequent to the exercise of stock options. Fussell dep. at 33-35.
>
> RESPONSE: Admit.[9]

Moreover, Crampton's assertion to that effect is based directly on the damning admission by Abbott's Vice President of Compensation and Development Stephen Fussell ("Fussell"), who is

---

[9]   Despite having covered the subject in her initial LR 56.1 Statement of Undisputed Material Facts, Crampton inexplicably repeated the identical language in her Statement of Additional Material Facts.  Then, in direct contradiction of its earlier admission, this time Abbott responded "Deny" (A. Resp. Add. St.¶9).  Abbott may not reverse the consequences of its earlier admission with such a subsequent denial--as the text discussion goes on to show, the admission was grounded in its own key executive's testimony, and it has proffered no evidence to show otherwise.

in charge of the administration of stock options (A. St. ¶88, C. St. ¶8). Fussell testified at his Dep. 34-35:

> A: If the question is outright no, they are not competing, then I would have to say the noncompete would not be enforced and they would be allowed to exercise shares, if I know they are not competing.
>
> Q: What if a person doesn't know if they are going to be competing in two weeks or a month, how does that affect you, if at all?
>
> A: If they are not competing at the time and we know that and can ascertain that in our conversations with them, then I would process this through as a noncompete.[10]

Thus Abbott's own interpretation of the contractual language refutes the position it now advances. Nothing daunted, Abbott proffers a fallback position: Crampton assertedly failed to make a valid exercise attempt on September 2 because her husband's phone call to Fowler did not comply with another contractual requirement (C. St. ¶6(c)):

> 15. The option may be exercised only by delivering to the secretary or other designated employee of the company a written notice of exercise, specifying the number of common shares with respect to which the option is then being exercised, and accompanied by payment of the full purchase price

---

[10] [Footnote by this Court] It is particularly significant in this respect that the option contract speaks of the immediate termination of the <u>option</u>, not of shares previously acquired through the exercise of an option, if the ex-employee were to engage in competitive activity. Hence if Abbott frustrates the option's timely exercise by its own nonperformance (as was the case here), it cannot bootstrap itself into assertedly excusable nonperformance by pointing to the ex-employee's competitive activity that commenced <u>after</u> the option would have been converted into stock ownership but for Abbott's own delay.

> of the shares being purchased in cash, [or by one
> of other enumerated methods of payment ].[11]

But although that language does require a written notice of
exercise accompanied by payment (something that did not take
place on September 2), Abbott cannot bootstrap itself into such a
defense because the noncompliance was caused by Abbott's own
refusal to supply the form that it treated as necessary to
satisfy the writing requirement (Swaback v. Am. Info. Techs.
Corp., 103 F.3d 535, 542-43 (7th Cir. 1996); Wasserman v.
Autohaus on Edens, Inc., 202 Ill. App.3d 229, 239, 559 N.E.2d
911, 918 (1st Dist. 1990)).

Abbott argues that the quoted language permits Crampton to
exercise her options without the exercise form by submitting any
form of written notice, thus purportedly rendering irrelevant
Fowler's refusal to fax Crampton the stock exercise form when her
husband requested it on September 2 (A. Ans. Mem. 7). But that
contention is also directly belied by one of Abbott's own
people--this time by Abbott's employee who processes stock option
exercises, Fowler. Here is her testimony confirming that a
signed stock option exercise form is a prerequisite to such
exercise (Fowler Dep. 21, 22, 74):

> Q: So at any rate, there's an exercise form that
> the person has to fill out, is what you're saying?

---

[11]    [Footnote by this Court]    In the 1997 option contract
this is paragraph 14 rather than 15 (C. St.¶7).

20

A:  Yes.

          *          *          *

     Q:  Okay.  In any case, for a person to exercise,
they have to--If I'm understanding this correctly, they
have to do two things: They have to fill out this form
indicating they want to exercise; then they have to in
some fashion pay for the stock?

     A:  They have to submit the form with some sort of
payment.

          *          *          *

     Q:  So this is the typical stock option exercise
form that any employee at Abbott is going to need to
sign in order to exercise stock options?

     A:  Any domestic employee.

Thus both parties understood the "written notice of

exercise" language to require submission of the form as a

necessary condition for the exercise of Crampton's stock options

(such a mutual understanding is part of the factual matrix under

such cases as Arthur Rubloff & Co. v. Comco Corp., 63 Ill. App.3d

362, 367, 380 N.E.2d 15, 19 (2d Dist. 1978)).  And a party such

as Abbott has an obligation to bring about the occurrence of such

a condition precedent that is wholly within its control (E.B.

Harper & Co. v. Nortek, Inc., 104 F.3d 913, 919 (7th Cir. 1997)

(Illinois law); Kipnis v. Mandel Metals, Inc., 318 Ill. App.3d

498, 505, 741 N.E.2d 1033, 1038 (1st Dist. 2000)).  So Fowler's

refusal to provide the form to Crampton because she did not have

the "required" non-compete verification form, a "requirement"

that is not at all articulated in the option contracts, prevented

Crampton from completing the formalities necessary to exercise her options right then and there.

In that respect Crampton points to <u>Swaback</u>, 103 F.3d at 537-43. Though dealing with a legally comparable situation in an ERISA case, the Court of Appeals relied on contract law in reaching its decision (<u>id</u>. at 542):

> It is basic contract law that a party who prevents the occurrence of a condition precedent may not stand on that condition's non-occurrence to refuse to perform his part of the contract.

Illinois contract law incorporates the selfsame principle (<u>Wasserman</u>, 202 Ill. App.3d at 239, 559 N.E.2d at 918).

Here Fowler gave Crampton's husband misinformation equivalent to what triggered the decision in <u>Swaback</u> by telling him that the options couldn't be exercised until Fowler had the non-compete verification form from Human Resources. According to Fowler herself, she told Svolopoulos on September 2 "[s]he's unable to exercise at this point in time because I don't have this piece of paper I need from human resources" and "[r]emember, you can't do anything until I have this piece of paper" (Fowler Dep. 40-41). Yet nowhere in the option contracts is there any mention of such an internal form (C. St. ¶53). It is universal conventional wisdom that where a written contract purports on its face to be a complete expression of the parties' agreement, a court will not add another term about which the contract is silent (<u>Am. States Ins. Co. v. A.J. Maggio Co.</u>, 229 Ill. App.3d

422, 426, 593 N.E.2d 1083, 1086 (2d Dist. 1992)). In this instance, because Abbott's refusal to provide Crampton with the necessary exercise form on September 2 was based on the phantom requirement of a non-compete verification form, Abbott may not rely on Crampton's failure to submit that form as a defense.

Abbott attempts to draw one final arrow from its quiver: It claims finally that it was under no obligation to provide the form because Crampton had been given one when she signed each option contract (A. Ans. Mem. 7). But that arrow is as devoid of a point as all the others, for the law is otherwise: Where as here one party's cooperation is necessary to secure the other party's performance, there is an implied contractual condition that such cooperation will be afforded (Kipnis, 318 Ill. App.3d at 505, 741 N.E.2d at 1038). And further undercutting Abbott's last-ditch contention, Fowler herself testified that because many employees misplaced the forms, she routinely faxed them to former employees who so requested (C. St. ¶16).

Additional Arguments

Because the just-discussed contract interpretation issue is dispositive, this opinion need not address the additional issues of (1) whether the Compensation Committee properly delegated its authority to make non-compete decisions and (2) whether Fowler's acceptance of Crampton's payment despite her knowledge that Crampton was employed operated as a waiver of the non-compete

23

provision. No view is expressed here on either subject.

Summary

To exercise her stock options Crampton had only, within three months of her termination and while not doing competitive work, to fill out the required exercise form and submit it along with payment. On September 2, less than a month after her termination, Crampton was not doing competitive work and was prepared to submit the form and the money (C. St. ¶18). And at that point Abbott knew that Crampton was not working and wished to exercise her options, for her husband told Fowler just that (id. ¶¶18, 20). But instead of honoring and processing Crampton's request, Fowler refused to fax Crampton the form required for that purpose--and refused solely because of a self-created impediment nowhere present in the option contracts. That being the case, Abbott has breached the contracts, making the non-compete clause an irrelevancy and entitling Crampton to summary judgment on that claim.

### Conclusion

Crampton has not carried her burden of showing a genuine issue of material (that is, outcome-determinative) fact on her retaliatory discharge claim. That being the case, Abbott is entitled to a judgment as a matter of law and Abbott's summary judgment motion is granted. That claim is dismissed.

There is also no genuine issue of material fact on

Crampton's breach of contract claim, but this time that compels judgment as a matter of law in Crampton's favor rather than Abbott's. As a matter of law, Abbott's refusal to honor Crampton's timely request to exercise her stock options was a breach of its obligations under the option contracts. Hence Crampton's motion is granted, so that judgment is ordered to be entered in her favor as to liability (Abbott's cross-motion is of course denied).

With the issue of liability having been thus resolved, Crampton is entitled to damages stemming from Abbott's refusal to process her option request. This action is set for a status hearing at 8:30 a.m. February 28, 2002 to discuss the procedures and timetable needed to resolve that issue.[12]

Milton I. Shadur
Senior United States District Judge

Date: February 19, 2002

---

[12]    As is often the case in this Court's opinions, the research and caselaw references here--and a material part of the analysis--owe more to the fine work by one of this Court's excellent law clerks (in this instance Jennifer Wright) than to the submissions of counsel for the litigants. Having said that, this Court hastens to add (as it invariably does when it is appropriate to pay such a tribute to one of its always outstanding law clerks) that it has carefully reworked each sentence and read each case cited in this opinion (and, of course, some uncited cases as well), so that the end product is this Court's own. If then any errors have found their way into the final version of this opinion, the sole responsibility must be laid at this Court's doorstep and not that of its law clerk.